# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| STATE OF MISSISSIPPI | PLAINTIFF |
| V. | CIVIL ACTION NO. 3:24-CV-718-KHJ-MTP |
| OPTUM, INC., et al. | DEFENDANTS |

ORDER

Before the Court are the [52, 54] Motions to Dismiss. For the reasons below, the Court grants the [52] Motion and grants in part and denies in part the [54] Motion.

## I. Background

This case arises from a state-court suit filed by the State of Mississippi ("State") against various pharmacy benefit managers ("PBMs") for their alleged roles in creating and sustaining an opioid epidemic in the state. *See* Compl. [1-4] ¶ 17. The Defendants removed the suit to this Court under the federal officer removal statute. Joint Notice of Removal [1] at 1–2; Order [31] at 24 (denying the State's [12] Motion to Remand). The State then amended its [1-4] Complaint and added six Defendants. *See generally* Am. Compl. [46]. As it stands, the State sues 18 Defendants[1] for public nuisance, negligence, violations of the Mississippi Consumer Protection Act, and unjust enrichment. *Id.* ¶¶ 402–537.

[1] Optum, Inc.; OptumRx, Inc.; OptumInsight Life Sciences, Inc.; OptumInsight, Inc.; UnitedHealth Group, Inc.; OptumHealth Care Solutions, LLC; Optum Health Holdings, LLC; OptumHealth Networks, Inc.; OptumRx Discount Card Services, LLC; Optum Perks, LLC; Evernorth Health, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC;

PBMs serve as intermediaries between prescription-drug insurers and pharmacies. *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83–84 (2020); *see also* [31] at 1–2 (summarizing PBMs' roles). So when "a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information." *Id.* at 84. And after "the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment." *Id.* The insurer then reimburses the PBM under the prescription-drug plan. *Id.*

PBMs offer other services as well. [1] at 4–5. They negotiate with pharmaceutical manufacturers for prescription drug rebates, and they develop formularies and utilization management tools for their clients. *Id.* at 5; *see also* [46] ¶ 14. "Formularies are lists of drugs covered by a pharmacy benefit plan," and they "are often constructed in tiers, where drugs listed on higher tiers require larger copays . . . ." [46] ¶ 15. Formularies include utilization management rules, which regulate some drugs by limiting coverage unless doctors follow certain safeguards in prescribing them. *See id.* ¶ 16. For example, utilization management could include

> (i) step therapy, where a beneficiary is required to try a different drug or therapy first before trying the restricted drug; (ii) quantity limits, which are limits on the dosage or days' supply that a patient may receive for any given prescription(s); and (iii) prior authorizations, . . . which are rules that require a physician to confirm that a given prescription is therapeutically appropriate before the drug is dispensed.

---

ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts Specialty Distribution Services, Inc.; Medco Health Solutions, Inc.; ESI Mail Order Processing, Inc.

*Id.* Higher-tier drugs are "more difficult and more costly to obtain." *Id.* ¶ 17. Conversely, lower-tier drugs that are not subject to utilization management restrictions are "dispensed with ease and frequency." *Id.*

The State alleges the Defendants played a key role "in facilitating the oversupply of opioids" by "colluding with" opioid manufacturers to increase opioid sales. *Id.* ¶¶ 4, 8; *see also id.* ¶ 162. According to the State, the Defendants "promoted and facilitated the use of opioids at unsafe levels." *Id.* ¶ 3. They "deceptively and dangerously" failed to "honestly or adequately disclose the risk of opioids," "maintain effective controls to prevent diversion in their own dispensing of opioids," and "monitor their own claims data and/or implement any measures to prevent suspicious or inappropriate prescriptions of lethal opioids from reaching consumers, their prescribing physicians, and illicit drug users." *Id.*

Seeking to avenge these wrongs, the State sued the Defendants for public nuisance, negligence, violations of the Mississippi Consumer Protection Act, and unjust enrichment. *Id.* ¶¶ 402–537. Some Defendants move to dismiss for lack of personal jurisdiction. Mot. to Dismiss [52]; Defs.' Mem. in Supp. [53]. And all 18 Defendants[2] move to dismiss for failure to state a claim. Mot. to Dismiss [54]; Defs.' Mem. in Supp. [55].

---

[2] The CM/ECF docket currently lists 19 Defendants. But the State's [46] Amended Complaint explicitly dismisses a previously named Defendant—The Lewin Group. [46] at 4 n.1. Accordingly, the Court directs the Clerk of Court to terminate The Lewin Group as a Defendant.

II. Standards

A. Rule 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), a lawsuit may be dismissed for a lack of personal jurisdiction. *See* Fed. R. Civ. 12(b)(2). "Plaintiffs bear the burden of proving the district court's personal jurisdiction, but relevant factual disputes will be resolved in plaintiffs' favor." *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424 (5th Cir. 2005). "Plaintiffs need only plead a prima facie case for personal jurisdiction." *Id.* The Court must take the "allegations contained in the complaint, except insofar as controverted by opposing affidavits," as true. *Colwell Realty Invs., Inc. v. Triple T Inns of Az., Inc.*, 785 F.2d 1330, 1333 (5th Cir. 1986). But the Court need not credit conclusory allegations. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

B. Rule 12(b)(6)

In reviewing a motion under Federal Rule of Civil Procedure 12(b)(6), "the central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (citation modified). A valid claim for relief contains "sufficient factual matter, accepted as true," giving the claim "facial plausibility" and allowing "the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). The plausibility standard does not ask for a probability of unlawful conduct but does require more than a "sheer possibility." *Id.* The Court must accept all factual allegations in the complaint as true, but it is

not bound to accept legal conclusions, conclusory statements, or bare assertions without factual support. *Id.*

III. Analysis

A. [52] Motion to Dismiss for Lack of Personal Jurisdiction

The following Defendants move to dismiss for lack of personal jurisdiction: UnitedHealth Group ("UHG"); Optum, Inc.; OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; OptumHealth Networks, Inc.; OptumRx Discount Card Services, LLC; and Optum Perks, LLC ("Moving Defendants"). [52].

"A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Mink v. AAAA Dev., LLC*, 190 F.3d 333, 335 (5th Cir. 1999).

The State's [46] Amended Complaint treats personal jurisdiction over all 18 Defendants as though it were a single issue. *See* [46] ¶¶ 146–150. It claims that this Court has personal jurisdiction over the Defendants because each one "purposefully availed itself of the privilege of doing business within Mississippi, and each derived substantial financial gain from doing so." *Id.* ¶ 148. But "[e]ach defendant's contacts with the forum [s]tate must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984). The State "may not aggregate defendants' forum contacts and may not establish personal jurisdiction without specifying who did what." *Pearson v.*

*Shriners Hosps. For Child., Inc.,* 133 F.4th 433, 442 (5th Cir. 2025). And "vague and generalized assertion[s]" do not "comport with applicable caselaw that requires plaintiffs to submit evidence supporting personal jurisdiction over each defendant without grouping them together." *Head v. Las Vegas Sands, Ltd. Liab. Corp.*, 760 F. App'x 281, 284 (5th Cir. 2019).

Accordingly, the Court rejects the State's conclusory assertion that all 18 Defendants purposefully availed themselves of the privilege of doing business in Mississippi. *See* [46] ¶ 148. Instead, the Court must look to each Moving Defendant's actions to determine whether personal jurisdiction is met.

1. Long-arm Statute

Mississippi's long-arm statute provides,

> Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

Miss. Code Ann. § 13-3-57.

Mississippi courts have construed the statute to recognize three jurisdictional bases: contract, tort, and "doing-business." *Fitch v. Wine Express, Inc.*, 297 So. 3d 224, 228 (Miss. 2020). In other words, to exercise jurisdiction, the Court must find that: (1) the Moving Defendants entered into contracts to be performed, in whole or in part, in Mississippi, (2) the Moving Defendants committed torts, in whole or in

part, in Mississippi, or (3) the Moving Defendants were "doing business" in Mississippi. *Farani v. File*, 565 F. Supp. 3d 804, 808 (S.D. Miss. 2021).

The State argues each Defendant committed part of a tort in Mississippi because the injury occurred in Mississippi. [58] at 9–10. Indeed, "an injury is necessary to complete a tort," so the long-arm statute is satisfied when the injury occurs in Mississippi. *Dunn v. Yager*, 58 So. 3d 1171, 1184 (Miss. 2011) (citation modified). Here, the State says the Defendants "directly caused substantial injuries in Mississippi" because their "misconduct facilitated the increased use of opioids in the State, creating a public health and safety crisis in Mississippi, [and] resulting in increased rates of crime, addiction, overdoses, and death." [58] at 10.

Even if this is a valid injury, the State has not explained how each Defendants' actions contributed to the injury in Mississippi. Since this concept overlaps with the Court's due process analysis, the Court addresses it in the section below.

2. Due Process

Due process recognizes two types of personal jurisdiction—general and specific. *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). The State argues the Court has specific jurisdiction over each Moving Defendant. [58] at 17.

To determine whether a court may exercise specific jurisdiction over a non-forum defendant without violating the Fourteenth Amendment's Due Process Clause, the Fifth Circuit uses a three-step analysis:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Savoie v. Pritchard*, 122 F.4th 185, 190–91 (5th Cir. 2024).

The minimum-contacts inquiry turns on whether each Moving Defendant took "some act whereby it purposefully availed itself of the privilege of conducting activities there, thus invoking the benefits and protections of its laws." *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469–70 (5th Cir. 2006). Each Moving Defendant's actions must show that it "reasonably anticipate[s] being haled into court" in Mississippi. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). The contacts must not be "random, isolated, or fortuitous." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (citation modified). Rather, they must stem from the Moving Defendant's choice to "reach[] out beyond" its home, such as "exploiting a market" in the forum state or entering a contractual relationship there. *Id.* (citation modified).

The parties separate the nine Moving Defendants into three groups. *See* [58] at 11–16, 18–22; [61] at 8–10, 12–14. For organizational purposes, the Court does the same. But in doing so, the Court will still consider the allegations against each Moving Defendant, not the Defendants as a group.

a. UHG and Optum, Inc.

The State argues that this Court has personal jurisdiction over UHG and Optum, Inc. either through these Defendants' own actions or "based on the control

they wielded as principals over their agent subsidiaries." [58] at 11, 13. The Court disagrees.

The State has not established sufficient contacts by UHG or Optum, Inc. based on their actions alone because the State has not shown that UHG and Optum, Inc. purposefully availed themselves of the privilege of conducting activities in Mississippi. The State alleges that "UHG is responsible for determining 'which drugs will be included in formulary listings and selecting which retail pharmacies will be included in the network offered to plan sponsors' members.'" [46] ¶ 56. Similarly, the State contends "Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services, including design of formularies used throughout Mississippi." *Id.* ¶ 60. In its [58] Response, the State explains that UHG and Optum, Inc. "design[ed] the drug formularies to which Mississippi patients are bound." [58] at 12. But the [46] Amended Complaint does not make clear what actions UHG or Optum, Inc. took to implement policies or formularies in Mississippi.

Thus, the allegations do not show sufficient contacts with Mississippi. The State does not allege that UHG and Optum, Inc. purposely directed the formularies to Mississippi, advertised the formularies in Mississippi, or performed PBM services in Mississippi. In fact, the State admits that OptumRx is "the Optum defendant that performed PBM services in Mississippi." [58] at 19. The [46] Amended Complaint only says that UHG and Optum, Inc. designed policies and formularies that were implemented in an unspecified way throughout the nation, including in

Mississippi. This is not enough to establish that UHG and Optum, Inc. purposefully availed themselves of the privilege of conducting activities in Mississippi.

The State also fails to establish sufficient contacts by UHG or Optum, Inc. based on an agency relationship. UHG and Optum, Inc. assert that they "are distinct corporate entities from OptumRx and do not themselves perform PBM services." [53] at 12. The State acknowledges that UHG and Optum, Inc. are "legally distinct" companies but argues they "controlled" the Defendants that performed services in Mississippi. [58] at 11, 20. So UHG and Optum, Inc. should be responsible for the actions and contacts of its "agent subsidiaries." *Id.*

Not quite. "A bedrock principle of corporate law is that a parent corporation is not liable for actions taken by its subsidiaries." *Bridas S.A.P.I.C. v. Gov. of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (citation modified). Mississippi law determines whether an exception applies here. *See Licea v. Curacao Drydock Co., Inc.*, 952 F.3d 207, 212 (5th Cir. 2015). In Mississippi, "Courts presume corporate separateness, although this presumption may be rebutted by clear evidence of a parent corporation asserting sufficient control over its subsidiary to render the subsidiary its agent or alter ego." *Davenport v. HansaWorld USA, Inc.*, 23 F. Supp. 3d 679, 697 (S.D. Miss. 2014) (citing *Dickson Marine Inc. v. Panalpina, Inc.,* 179 F.3d 331, 338 (5th Cir. 1999)). If the subsidiary is the parent corporation's agent or alter ego, the Court may pierce the corporate veil and attribute the subsidiary's actions to the parent company.

To survive Rule 12(b)(2) under this theory,

> a plaintiff's complaint alleging a piercing of the corporate veil . . . [must] set[ ] forth factual allegations indicating: (1) some frustration of expectations regarding the party [over which the Court has jurisdiction]; (2) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and (3) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder.

*Est. of Gaines v. FedEx Ground Package Sys., Inc.*, No. 3:21-CV-617-DPJ-LGI, 2022 WL 894108, at *4 (S.D. Miss. March 25, 2022) (quoting *Canadian Nat'l Ry. Co. v. Waltman*, 94 So. 3d 1111, 1116–17 (Miss. 2012)). The State fails to meet this burden.

The State says UHG "controls the company-wide policies," and Optum, Inc. "is directly involved . . . in the company policies that inform its PBM services." [46] ¶¶ 54, 60. And "the CEO of Optum, Inc. is directly responsible for its business units—OptumInsight, OptumHealth and OptumRx, and the CEOs of these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary design and mail-order activities." *Id.* ¶ 61. Allegations that UHG or Optum, Inc. are "directly involved" in company policies and that other CEOs "reported directly" to Optum, Inc.'s CEO are insufficient to allow the Court to pierce the corporate veil. Therefore, the Court declines to attribute the subsidiaries' actions to UHG and Optum, Inc. to establish personal jurisdiction.

In sum, the State has failed to establish that UHG and Optum, Inc. have sufficient contacts in the forum. So the Court lacks personal jurisdiction over them.

Case 3:26-cv-00718-KHJ Document 27 Filed 06/01/26 Page 12 of 41

b. The "OptumInsight" and "OptumHealth" Defendants

The State also fails to establish the Court's personal jurisdiction over OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and OptumHealth Networks, Inc.

There are several problems with how the State addresses these Defendants. First, it does not explain each individual Defendant's contacts with Mississippi. Other than the paragraphs in which the State names OptumInsight, Inc. and OptumInsight Life Sciences, Inc. as Defendants, the State never refers to them individually. Instead, the State lumps these two together as "OptumInsight." [46] ¶ 90. It does the same with OptumHealth Care Solutions, LLC, OptumHealth Holdings, LLC, and OptumHealth Networks, Inc. by grouping them all together as "OptumHealth." *Id.* ¶ 83. Soon after, the [46] Amended Complaint collapses the two "OptumInsight" Defendants, the three "OptumHealth" Defendants, and five other Defendants into one label—"Optum." *Id.* ¶ 95. It is not inherently wrong to group defendants together for certain purposes. *See, e.g.*, *Cook. v. Miss. Farm Bureau Cas. Ins. Co.*, No. 1:18-cv-76-GHD-DAS, 2018 WL 5929629, at *3 (N. D. Miss. Nov. 13, 2018). But the State cannot satisfy its jurisdictional burden by substituting a collective label for Defendant-specific analysis. *Smith v. Antler Insanity, LLC*, 58 F. Supp. 3d 716, 722 (S.D. Miss. 2014) (citing *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 793 (5th Cir. 2007) (citation omitted)).

Second, even if the Court accepts the allegations lodged at "OptumInsight" and "OptumHealth," those allegations are too vague and conclusory to establish

contacts with Mississippi. "[V]ague and generalized assertion[s]" do not "comport with applicable caselaw that requires plaintiffs to submit evidence supporting personal jurisdiction over each defendant without grouping them together." *Head*, 760 F. App'x at 284; *see also Calder*, 465 U.S. at 790.

The State says, "OptumInsight worked directly with opioid manufacturers to expand the opioid market throughout the United States and in Mississippi." [46] ¶ 91. It alleges OptumInsight "partnered with various opioid manufacturers to create studies, marketing, educational programs, and even identify algorithms to simultaneously downplay opioids' addictive properties and expand their use and availability throughout the country, including in Mississippi." *Id.* ¶ 91. And it "analyzed data and other information concerning opioid prescription claims data and health plans' opioid utilization for use in its research and consulting efforts in coordination with opioid manufactures' efforts to expand the opioid market and increase opioid utilization nationwide, including Mississippi." *Id.* ¶ 94. In sum, "OptumInsight" researched opioids and gave that information to opioid manufacturers. These allegations do not show that OptumInsight, Inc. and OptumInsight Life Sciences, Inc. have purposely availed themselves of the privilege of conducting activities in Mississippi.

As for the "OptumHealth" Defendants, the State says they "provide[] medical services as well as education and support for individuals throughout the country." *Id.* ¶ 57, 84. And OptumHealth "partnered with Purdue to 'educate' many case managers, nurse practitioners, and medical directors throughout [UHG's] various

enterprises." *Id.* ¶ 85. These allegations are too vague and conclusory to show that the three OptumHealth Defendants purposefully availed themselves of the privilege of conducting activities in Mississippi.

The State also says that the 10 "Optum" Defendants are sued in their capacities as "(1) PBM; (2) data analytics, consulting, and research provider; and (3) mail-order pharmacy." [46] ¶¶ 95–96. And "[a]t all relevant times," the 10 "Optum" Defendants "performed these services and derived substantial revenue in Mississippi." [46] ¶ 96. In a complex, 123-page complaint, this statement is not enough to show what minimum contacts each Defendant has with Mississippi.

In a final attempt to establish personal jurisdiction, the State claims its "allegations that OptumInsight and OptumHealth expanded the opioid market and opioid utilization 'in Mississippi' . . . are directly related to the State's claims against Defendants." [58] at 21. While OptumInsight and OptumHealth's research and education throughout the country may be related to the claims, this does not necessarily mean the Defendants have sufficient contacts with Mississippi.

So the Court lacks personal jurisdiction over OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and OptumHealth Networks, Inc.

c. OptumRx Discount Card Services, LLC and OptumPerks, LLC

The State also fails to establish the Court's personal jurisdiction over OptumRx Discount Card Services, LLC and OptumPerks, LLC.

Case 3:26-cv-00718-KHJ Document 42 Filed 10/3/26 Page 15 of 41

The State says OptumRx Discount Card Services, LLC "contracts with third-party businesses to administer prescription discount cards on their behalf." [46] ¶ 74. And OptumPerks, LLC "is a discount card program." *Id.* ¶ 76. The State also alleges, "Optum . . . collects set administrative fees for every opioid paid for with either its own discount card or one of its administered cash cards—which are governed by either Optum Perks, LLC or Optum Discount Card Services, LLC." *Id.* ¶ 299. This is the extent to which the State singles out these Defendants. Other than that, the State only refers to these Defendants as part of the 10 "Optum" Defendants. *Id.* ¶¶ 83, 90, 95.

According to the State, the Court has personal jurisdiction over these Defendants because they "played a significant role in the opioid epidemic" and "performed their various PBM services in Mississippi." [58] at 22 (citing [46] ¶¶ 68, 95–96). But as with the "OptumInsight" and "OptumHealth" Defendants, the only time the State alleges OptumRx Discount Card Services, LLC and OptumPerks, LLC performed services in Mississippi is when it alleges all 10 "Optum" Defendants performed various services in Mississippi. [46] ¶ 96. This is not enough to show that OptumRx Discount Card Services, LLC and OptumPerks, LLC purposely directed activities toward Mississippi or purposefully availed themselves of the privileges of conducting activities there. So the Court lacks personal jurisdiction over Optum Discount Card Services, LLC and Optum Perks, LLC.

3. Jurisdictional Discovery

At the end of its [58] Response Memorandum, the State requests jurisdictional discovery. [58] at 18–19. The Court denies this request for two reasons—it violates this Court's local rules and fails to meet the standard for jurisdictional discovery.

Local Rule 7 explains that "[a] response to a motion may not include a counter-motion in the same document." L.U. Civ. R. 7(b)(3)(C). Instead, the motion "must be an item docketed separately from a response." *Id.* By requesting jurisdictional discovery at the end of its [58] Response Memorandum instead of in a separate motion, the State violated this rule.

But even if the State had filed its one-paragraph argument as a separate motion, it still fails because it does not meet the jurisdictional-discovery standard. To warrant jurisdictional discovery, the State must "present[] factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts." *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005) (citation modified). It may not merely reference documents that "could potentially show Mississippi connections if they existed," and it must do "more than rely on vague assertions that additional discovery will produce needed, but unspecified facts." *Pace v. Cirrus Design Corp.,* 93 F.4th 879, 902 (5th Cir. 2024). The State's cursory argument for jurisdictional discovery does not meet this standard.

B. [54] Motion to Dismiss

All 18 Defendants move to dismiss the [46] Amended Complaint for failure to state a claim upon which relief can be granted. [54] at 1. As explained above, the Court lacks personal jurisdiction over the nine Defendants who filed the [52] Motion. So the Court considers the [54] Motion as to the remaining nine Defendants—OptumRx, Inc.; Evernorth Health, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts Specialty Distribution Services, Inc.; Medco Health Solutions, Inc.; and ESI Mail Order Processing, Inc.

The Defendants argue that federal law preempts the State's claims and that the State's claims are implausible. *See* [55]. The Court addresses the arguments in turn.

1. Preemption

The Defendants argue that the Medicare Act and the Employment Retirement Income Security Act ("ERISA") preempt the State's claims. [55] at 11. They say the claims relate to actions Defendants "allegedly took, or failed to take, in connection with their administration of prescription drug benefits on behalf of their health plan clients." [55] at 11. And since "[m]ost of those clients are health plans organized under Medicare Part D or ERISA," the claims are preempted. *Id.* at 11–12.

a. The Medicare Act

The Medicare Act preempts the State's claims in part.

Defendants claim that with respect to their Part D clients, they "administer pharmacy benefits according to regulations adopted by the Centers for Medicare and Medicaid Services ('CMS')." *Id.* at 12. So they argue the State's claims are preempted to the extent they "seek[] to impose liability on the PBM Defendants based on the selection, pricing, and formulary coverage of prescription opioids, and the implementation of utilization management tools" for Medicare Part D plans. *Id.* at 12.

Part D of the Medicare Act "provides prescription drug benefits to those who are eligible for benefits under Medicare Part A or enrolled under Part B." *La. Indep. Pharmacies Ass'n v. Express Scripts, Inc.*, 41 F.4th 473, 476 (5th Cir. 2022) (citing 42 U.S.C. § 1395w-101(a)(1), (a)(3)(A)). "Congress structured Part D as a public-private partnership under which private insurance companies, known as plan sponsors, administer Part D's prescription drug benefits" under a Medicare Prescription Plan or Medicare Advantage plan. *Id.* Usually, PBMs administer these plans. *Id.* Congress has specified that "[t]he standards established under this part shall supersede any State law or regulation . . . with respect to [Part D] plans." 42 U.S.C. § 1395w-26(b)(3) (Medicare Part C preemption provision); *Id.* § 1395w-112(g) (incorporating the preemption provision into Part D).

The Medicare Act expressly preempts state laws and regulations, but whether it also preempts state common-law claims—the kind the State presses here—remains an open question in the Fifth Circuit. The Fifth Circuit has acknowledged that the Medicare Act's preemption over state common-law claims is

a colorable defense for purposes of federal officer removal. *Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 346–47 (5th Cir. 2024). By deeming it a colorable defense, the Fifth Circuit did not necessarily say it is a winning argument. But it did confirm that the argument is "plausible" and not "wholly insubstantial and frivolous" for removal purposes. *Id.* Since then, a Texas district court held that "the Medicare Act preempts state law tort claims" and found a plaintiff's tort claim preempted when it arose "from the denial of benefits and coverage determinations under [a] Medicare Advantage plan." *Doraine Holmes v. United Healthcare Ins. Co.*, No. 3:24-CV-3189-K-BW, 2025 WL 4475747, at *9 (N.D. Tex. Dec. 15, 2025), *report and recommendation adopted*, 2026 WL 769893 (N.D. Tex. Mar. 18, 2026).

The Ninth Circuit also found that Medicare Part D preempts "at least some common law claims." *See Uhm v. Humana, Inc.*, 620 F.3d 1134, 1155 (9th Cir. 2010). In *Uhm*, Medicare beneficiaries sued their Part D provider for various state-law claims such as fraud. *Id.* at 1138–39. The Ninth Circuit explained that to determine whether the defendant committed fraud, the court "would necessarily need to determine whether the written and oral statements were misleading." *Id.* at 1157. And if a state court determined that the defendant's "marketing materials constituted misrepresentations resulting in fraud . . . , it would directly undermine CMS's prior determination that those materials were not misleading and in turn undermine CMS's ability to create its own standards for what constitutes 'misleading' information about Medicare Part D." *Id.* Accordingly, Medicare Part D preempted the common-law fraud claim. *Id.*; *see also Aylward v. SelectHealth, Inc.*,

35 F.4th 673, 681 (9th Cir. 2022) (Medicare Part C preempted common-law claims even when the state-law cause of action "parallels, enforces, or supplements express standards established under Part C and its implementing regulation.").

The Tenth Circuit points the other way, presuming—without extended analysis—that "Congress did not intend for Part D to preempt state laws of general applicability, such as . . . tort law." *Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1206 n.22 (10th Cir. 2023). But guided by the Fifth Circuit's *Caris* decision and persuaded by the Ninth Circuit's extensive *Uhm* analysis, this Court finds that Part D of the Medicare Act preempts some of the State's claims.

The State acknowledges that CMS regulates the administration of Part D plans but argues its claims are not preempted because they do "not challenge which drugs are included on Defendants' formularies" or "seek to hold Defendants liable for any specific drug utilization management measures, or lack thereof, or for the information provided, or not provided, to CMS." [60] at 14. Instead, it seeks to hold Defendants liable for "covertly colluding with opioid manufacturers to encourage opioid prescribing," "assisting opioid manufacturers in their deceptive marketing," "failing to use their data to reduce the amount of opioids flowing into Mississippi," and "dispensing opioids through their mail-order pharmacies without first ensuring that prescriptions were for a legitimate medical purpose." *Id.*

But the [46] Amended Complaint does seem to challenge the adequacy of Defendants' formularies and utilization management restrictions. *See, e.g.*, [46] ¶¶ 183, 190, 192, 264. Again, CMS regulates how Part D formularies are made,

marketed, and distributed. *See* 42 C.F.R. §§ 423.120(b), 423.2261. So the Court may not use common-law standards to assess their adequacy. To the extent the State seeks to hold Defendants liable for administering Part D plans governed by CMS, those claims are preempted. But the rest of the State's claims survive preemption. *See Alaska v. Express Scripts, Inc.*, No. 3:23-cv-00233-JMK, 2024 WL 2321210, at *11 (D. Alaska May 22, 2024) ("Medicare Part D preempts the State's claims insofar as they seek to impose liability for [Defendant's] administration of Part D plans."); *King Cnty. v. Express Scripts, Inc.*, No. 24-cv-49-BJR, 2025 WL 1082130, at *9 (W.D. Wash. Apr. 10, 2025) (Medicare Part D did not preempt claims "that Defendants colluded with opioid manufacturers to promote opioid use for financial gain.").

In sum, the Medicare Act preempts part of the State's claims, but the State may still pursue the claims to the extent it seeks to hold Defendants liable for actions not governed by the Medicare Act, such as administration of other health care plans.

b. ERISA

Defendants similarly argue that ERISA preempts the State's claims because many of Defendants' clients are health plans organized under ERISA. [55] at 11, 14. It does not.

ERISA applies to "employee welfare benefit plans that are established or maintained for the benefit of employees." *Provident Life & Acc. Ins. Co. v. Sharpless*, 364 F.3d 634, 638 (5th Cir. 2004) (citation modified). Put differently, it

governs employers who offer benefit plans to their employees. ERISA's central goal is to "to protect the interests of employees and their beneficiaries in employee benefit plans." *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1296 (5th Cir. 1989). And it does so by requiring "the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b).

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). And a "state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Rutledge*, 592 U.S. at 86 (citation modified). It has an "impermissible connection" with an ERISA plan when it "governs a central matter of plan administration or interferes with nationally uniform plan administration." *Id.* at 86–87 (citation modified). A state law "refers to ERISA if it acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Id.* at 88. The preemption provision applies to state common-law claims. *See Broussard v. Exxon Mobile Corp.*, No. 24-30664, 2025 WL 754536, at *2 (5th Cir. Mar. 10, 2025) (per curiam); *Hall v. NewMarket Corp.*, 747 F. Supp. 2d 711, 715 (S.D. Miss. 2010) (citing *Lee v. E.I. DuPont de Nemours & Co.,* 894 F.2d 755, 757–58 (5th Cir. 1990)).

The Fifth Circuit has "devised a two-pronged test for determining whether a state-law claim falls within [ERISA's] preemptive sweep." *Broussard*, 2025 WL 754536, at *2. ERISA preempts a state-law claim if "the claim (1) addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) directly affects the relationship among the traditional ERISA entities, such as the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Id.*; *see also Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 245 (5th Cir. 1990).

Defendants' argument fails on both prongs—the State does not challenge a beneficiary's right to receive benefits or some other area of exclusive federal concern, and the claims do not directly affect the relationship among the traditional ERISA entities. The State is a third party suing for public costs, not an ERISA entity seeking plan benefits. And the claims challenge PBMs' actions such as designing formularies and marketing opioids. They do not seek to "impose any specific, substantive restrictions on Defendants' formularies or the opioids that are on them." [60] at 18. Instead, the State seeks to preclude Defendants "from operating their businesses in a way that floods prescription opioids into Mississippi so as to create a public nuisance and/or constitutes an unfair or deceptive trade practice." *Id.* at 18–19.

Other district courts have found ERISA does not preempt similar claims in opioid-crisis suits. *See Ohio Cnty. Comm'n v. Express Scripts, Inc.*, No. 5:24-CV-142, 2024 WL 5701504, at *9–10 (N.D. W.V. Dec. 23, 2024); *Alaska v. Express Scripts,*

*Inc.*, 2024 WL 2321210, at *9; *King Cnty. v. Express Scripts, Inc.*, No. 24-CV-49-BJR, 2025 WL 1082130, at *9 (W.D. Wash. Apr. 10, 2025). An Alaska district court explained that the claims "are not merely based on the structure of the formularies, but on the manner in which [the Defendants] arrived [at] their structure: allegedly by ignoring evidence that suggested the need for utilization management due to its financial agreements with manufacturers and desire for profits." *Alaska v. Express Scripts, Inc.*, 2024 WL 2321210, at *10. So too here. A favorable ruling for the State will not govern an employee's ERISA protection or interfere with the national uniformity of employee benefit plans. Rather, a favorable ruling will hold Defendants liable for ignoring evidence that suggested the need for utilization management and for improperly promoting opioid use. Put differently, the claims target Defendants' conduct, not the structure of ERISA plans.

Defendants provided supplemental authority from the Sixth Circuit. *See* Suppl. Authority [68]. There, Tennessee lawmakers became concerned with certain PBM practices such as steering business to pharmacies they own and excluding small, rural pharmacies. *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 250–251 (6th Cir. 2026). So Tennessee enacted laws to "ban interference with a patient's choice of pharmacy and restrict the provision of incentives for patients to choose certain pharmacies over others." *Id.* at 250. The Sixth Circuit found that these laws had an impermissible connection with ERISA because they sought to upend the structure of health care plans "by requiring PBMs to admit all pharmacies to a

preferred network." *Id.* at 264. Therefore, the laws "require[d] a plan to be designed in a particular way," which ERISA prohibits. *Id.*

This case is distinguishable from *McKee Foods* in two main ways. First, the plaintiff, McKee Foods, was an employer who administered ERISA plans, not a state. *See id.* at 250. Second, McKee Foods challenged state statutes that targeted the structure of ERISA plans, not common-law claims that target PBM conduct. The statutes challenged in *McKee Foods* required PBMs to structure their plans in a specific way in Tennessee. But here, the State's common-law claims do not require PBMs to redesign or restructure ERISA plans—they seek to hold PBMs liable for improper conduct in creating, marketing, and distributing plans.

So the State's claims do not "relate to" ERISA and therefore are not preempted.

2. Public Nuisance

The State has sufficiently stated a claim for public nuisance. The Mississippi Supreme Court has described "public nuisance" as follows:

> (1) A public nuisance is an unreasonable interference with a right common to the general public.
> (2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
> > (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
> > (b) Whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
> > (c) Whether the conduct is of a continuing nature or has produced a permanent or longlasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

*Comet Delta, Inc. v. Pate Stevedore Co. of Pascagoula, Inc*, 521 So. 2d 857, 860 (Miss. 1988) (quoting Restatement (Second) of Torts § 821B). The interference "must be of a public right," meaning "the nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several." *Id.* (citation modified). But "[i]t is not necessary . . . that the entire community be affected, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right." *Id.* (citation modified).

The Mississippi Supreme Court has not ruled on whether a public-nuisance claim may be based on the use of a lawful product. So this Court must make an *Erie* guess. In doing so, the Court's "task is to attempt to predict state law, not to create or modify it." *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 519 (5th Cir. 2018). Accordingly, the Court turns to Mississippi's public-nuisance case law to predict whether the Mississippi Supreme Court would recognize a public-nuisance claim under the circumstances here.

The Mississippi Supreme Court has recognized a public nuisance when a defendant's conduct threatens public safety. In *Bosarge v. State*, the Mississippi Supreme Court found that the operation of a bar "and the activities around it constituted a nuisance and a detriment to society" when intoxicated minors caused car wrecks after leaving the bar. 666 So. 2d 485, 492 (Miss. 1995). The bar's owners claimed to only sell alcohol to those over 21, but law enforcement uncovered several instances of the bar selling alcohol to minors. *Id.* at 486–88. So the State of Mississippi sued the bar's owners and demanded abatement of the public nuisance.

*Id.* at 489. The owners claimed to have taken several precautions such as hiring two bouncers to guard the door and stamp the underage patrons, requiring patrons to recite their driver's license information to confirm their identity, and maintaining photographs of minors known to frequent the bar. *Id.* at 488. Still, the court held that "an inebriated minor who drives home" from the bar is a "threat to the entire community." *Id.* at 492. So by failing to properly manage this situation, the bar created a public nuisance. *Id.*

Moreover, the Hinds County Circuit Court has denied motions to dismiss public nuisance claims in similar opioid-crisis cases. *See* Hinds Cnty. Circuit Ct. Orders [54-1, 54-2, 54-3]. And in the private-nuisance context, the Mississippi Supreme Court has recognized that a lawful business may become a nuisance when it materially injures others. *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 14 (Miss. 2007).

Other courts are split as to the application of public nuisance law in similar opioid cases. The Fourth Circuit held that "under West Virginia law, an unreasonable interference with a right common to the general public resulting from the distribution of opioids may qualify as a public nuisance when the evidence establishes that distribution of this product unreasonably operates to hurt or inconvenience an indefinite number of persons." *City of Huntington, W. Va. v. AmerisourceBergen Drug Corp.*, 157 F.4th 547, 563 (4th Cir. 2025) (citation modified). The court based its decision on "(1) West Virginia's broad definition of a public nuisance, (2) the lack of any decision by West Virginia's highest court

limiting that definition with respect to product-based harms, and (3) the high court's admonition that whether a nuisance exists is a factual issue." *Id.*

The Fourth Circuit's three considerations apply with equal force to Mississippi law. The Mississippi Supreme Court, like West Virginia's highest court, uses the broad definition of public nuisance from the Restatement (Second) of Torts. *See Comet Delta, Inc.,* 521 So. 2d at 860 (quoting Restatement (Second) of Torts § 821B). This Court is unaware of any Mississippi Supreme Court decisions limiting this definition with respect to product-based harms. And the Mississippi Supreme Court has explained that whether a nuisance exists is a question of fact. *Bosarge*, 666 So. 2d at 491.

Several federal district courts have ruled similarly to the Fourth Circuit. *See In re Nat'l Prescription Opiate Litig.*, 458 F. Supp. 3d 665, 691–92 (N.D. Ohio 2020) (denying a motion to dismiss public nuisance claim under Michigan law in an opioid-crisis case); *Alaska v. Express Scripts, Inc.*, 2024 WL 2321210, at *4 ("Alaska law allows for a claim of public nuisance that is not property-based and based on the use of a lawful product."); *In re McKinsey & Co., Inc. v. Nat'l Prescription Opiate Litig.*, No. 3084 CRB, 2024 WL 2261926, at *8 (N.D. Cal. May 16, 2024) (acknowledging a cause of action for public nuisance in an opioid case).

A few courts have held or implied otherwise. The Oklahoma Supreme Court found that public nuisance law does not apply to the manufacturing, marketing, and selling of lawful products. *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 725 (Okla. 2021). And the Maryland Supreme Court recently acknowledged

that it has never recognized a public nuisance cause of action based on lawful products. *Express Scripts, Inc. v. Anne Arundel Cnty.*, No. 1:24-cv-90-MJM, 2026 WL 797872, at *35 (Md. Mar. 23, 2026). But Oklahoma and Maryland do not define "public nuisance" the same as Mississippi. Oklahoma uses its own statutory definition. *Hunter*, 499 P.3d at 724. And Maryland has not adopted the "expansive tort of public nuisance based upon the definition contained in [Section] 821B of the Second Restatement." *Express Scripts, Inc.*, 2026 WL797872, at *34–35. Mississippi has adopted the Second Restatement's expansive definition. *See Comet Delta, Inc.,* 521 So. 2d at 860.

Based on the Mississippi Supreme Court's reasoning in *Bosarge* and *Biglane* and the three considerations the Fourth Circuit relied on in *City of Huntington*, this Court finds Mississippi law recognizes a claim for public nuisance for product-based harms. So the Court turns to whether the State has plausibly alleged the elements of a public-nuisance claim. *See Comet Delta, Inc.,* 521 So. 2d at 860–61 (explaining the elements of public nuisance in Mississippi).

a. Public Rights

Defendants first argue that the State has not alleged an interference with a public right because the claim is "based on the alleged misuse of prescription opioids by individuals—*not* interference with a public right." [55] at 16, 18. The State says its public nuisance claim "is based on the collective damage to public health, safety, peace, comfort[,] and convenience." [60] at 20. For example, the State alleges that Defendants' actions have "caused the State to incur substantial costs and divert

increased resources to law enforcement and first responder costs; county health facilities; the criminal justice system; drug prevention, education and community outreach programs; victim services; and general societal and lost productivity costs." *Id.* at 20–12 (citing [46] ¶¶ 381–82). And the [46] Amended Complaint explains that Defendants' actions caused harm such as the "creation and fostering of an illegal, secondary market for prescription opioids," "[e]asy access to prescription opioids by children and teenagers," "expos[ure] to people addicted to drugs and people seeking drugs," and exposure to "opioid-related crime in public spaces." [46] ¶ 422.

As the Court already discussed, Mississippi recognizes a right to public safety. *See supra* Section III.B.2. And the Court agrees with other jurisdictions' application of public-nuisance law to opioid cases like this one. So the Court finds the State has plausibly alleged that Defendants' actions interfered with the right to public safety.

b. Control

Next, Defendants seek dismissal of the State's public-nuisance claim because Defendants did not have control over the instrumentality of the nuisance: the opioids. [55] at 19–20. The State argues that the instrumentality of the nuisance is not the opioids but "Defendants' conduct in creating and fueling the oversupply of opioids into Mississippi." [60] at 26. And even if the instrumentality of the nuisance were the opioids, "Defendants controlled the flow of opioids through their mail-order pharmacies." *Id.*

Again, whether a nuisance exists is a question of fact. *Bosarge*, 666 So. 2d at 491. It follows that whether a defendant had control over a nuisance is also a question of fact. The Mississippi Supreme Court has recognized the existence of a public nuisance when a "condition is directly traceable to [the defendant's] non-compliance" with an ordinance. *Robinson v. Indianola Mun. Separate Sch. Dist.*, 467 So. 2d 911, 918 (Miss. 1985). Under this reasoning, Defendants could be liable if the repercussions of opioid abuse and addiction are directly traceable to their actions. The State has alleged enough facts to make this plausible.

c. Damages

Finally, the parties disagree on the damages available to the State under public nuisance law. [55] at 21; [60] at 28. Defendants ask the Court to "limit the State to non-monetary injunctive relief." [62] at 11. But the Court need not rule on what damages the State is entitled to at this stage. The parties at least agree that injunctive relief is available, so the public nuisance claim survives under Rule 12(b)(6).

3. Negligence

The State says the Defendants negligently "promot[ed] opioid over-use and . . . facilitate[ed] access to opioids through their standard formulary and [utilization management] offerings and their mail-order pharmacies." [46] ¶ 469. To establish negligence, the State must show duty, breach, causation, and damages. *Sanderson Farms, Inc. v. McCullough*, 212 So. 3d 69, 76 (Miss. 2017). Defendants argue that the State has not established duty or causation. [55] at 22–26. But the State

responds that the Defendants "voluntarily undertook a legal duty to the State to use reasonable care and skill not to not create a foreseeable risk of harm." [60] at 30.

Whether the Defendants owed a duty to the State "is a question of law to be decided by the Court." *Rein v. Benchmark Constr. Co.*, 865 So. 2d 1134, 1143 (Miss. 2004) (citation modified). Under Mississippi law, a duty can arise when a party "undertakes the performance of an act." *Patton v. Nissan N. Am., Inc.*, 143 F. Supp. 3d 468, 472 (S.D. Miss. 2015) (quoting *Dr. Pepper Bottling Co. of Miss. v. Bruner*, 148 So. 2d 199, 201 (Miss. 1962)). But "the liability is limited to the extent of the undertaking," and the "important component . . . is that the injury is reasonably foreseeable." *Rein*, 865 So. 2d at 1143–47.

Defendants acknowledge that reasonably foreseeable harms associated with their actions could give rise to a duty. *See* [55] at 23. Thus, the question of duty boils down to whether the injuries were foreseeable. An injury is not foreseeable "if a person of ordinary intelligence would not have anticipated the dangers that his negligent act created for others." *Sanderson Farms, Inc*, 212 So. 3d at 76 (citation modified). But "foreseeability does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." *Id.* (citation modified).

Opioids are addictive drugs and have a high potential for abuse. [46] ¶ 26. The State says Defendants collected data and tracked opioid usage (*Id.* ¶¶246–47, 250, 355), had the ability to identify "red flags" associated with patients' opioid usage (*Id.* ¶ 251), and knew they could influence the accessibility of opioids through

formularies and utilization management tools (*Id.* ¶ 17). Despite this unique knowledge about the dangers associated with opioids, the State contends Defendants placed opioids favorably on their formularies (*Id.* ¶ 397), failed to install adequate utilization management restrictions (*Id.*), sold their data to opioid manufacturers (*Id.* ¶ 24), and dispensed opioids through mail in pharmacies without adequate procedures in place (*Id.* ¶ 345). The State says it is reasonably foreseeable that Defendants' conduct could cause harm associated with opioid addiction and abuse in Mississippi.

Although the Court is skeptical that the law imposes a duty of the scope the State alleges, the Court cannot say at the pleading stage, viewing the [46] Amended Complaint in the light most favorable to the State, that the claim is implausible on its face. This is not an endorsement of the State's duty theory. Rather, it reflects that the duty question requires a fuller record before the Court can rule as matter of law. [3]

Defendants also argue the State has not alleged causation. [55] at 24. But unlike duty, causation is a question of fact. *Greer v. Key*, 428 So. 3d 333, 338 (Miss.

---

[3] A West Virginia district court did recognize such a duty. There, the court found that similar defendants owed a duty to a collection of West Virginia cities, towns, and counties. *Ohio Cnty. Comm'n*, 2024 WL 5701504, at *14. The court explained that under West Virginia law, courts "must consider foreseeability of risk" and other "policy considerations" when determining whether a duty exists. *Id.* at *13 (citation modified). So a duty can be imposed on a defendant when the defendant's conduct "is sufficiently likely to result in the kind of harm experienced." *Id.* (citation modified). The court recognized this duty in its opioid-crisis case because "it was reasonably foreseeable that [the plaintiffs] would be forced to bear the public costs of increased harm from the alleged over-prescription and oversupply of opioids in their communities if defendants failed to implement and/or follow adequate controls in their marketing, sales, distribution, and dispensing of opioids." *Id.* at *14.

2026). And the Court finds the State's allegations make causation plausible. For example, the State says Defendants made opioids more accessible through favorable formulary placement and limited utilization management restrictions ([46] ¶ 397), colluded with opioid manufacturers to deceptively promote opioid usage (*Id.* ¶ 163), and dispensed opioids through mail in pharmacies without adequate procedures in place (*Id.* ¶ 345).

In sum, the State has alleged enough for its negligence claim to survive the motion-to-dismiss stage.

4. Unjust Enrichment

Next, Defendants say the State failed to state a claim for unjust enrichment because "it does not allege that it paid Defendants." [55] at 27. The Court disagrees.

Unjust enrichment "applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another." *Hughes v. Shipp*, 324 So. 3d 286, 290 (Miss. 2021). "[T]he basis for an action for unjust enrichment lies in a promise, which is implied in law, that one will pay to the person entitled thereto which in equity and good conscience is his." *Id.* at 291.

The State says Defendants were unjustly enriched because they received profits from their "conscious wrongdoing" and left the State to pay for "the cost of the harms caused by Defendants' improper practices." [46] ¶¶ 526, 530. Put differently, the State "expended substantial amounts of money to remedy or mitigate the societal harms caused by Defendants' conduct, and . . . these

expenditures helped sustain Defendants' businesses." [60] at 37. Defendants say the State failed to state a claim for unjust enrichment because "it does not allege that it paid Defendants" and "cannot show that Defendants are liable for the costs of public services the State provides in carrying out governmental functions." [55] at 27–28.

But the State has stated a claim for unjust enrichment because it alleges that it paid for Defendants' externalities. [46] ¶ 530, 532. Mississippi law allows for recovery under unjust enrichment even if the plaintiff did not directly pay the defendant. In *Owens Corning v. R.J. Reynolds Tobacco Co.*, an asbestos producer sued tobacco companies for unjust enrichment because the asbestos producers paid money to remedy injuries the tobacco companies had caused. 868 So. 2d 331, 335 (Miss. 2004). Several individuals had sued the asbestos producer for damaging their health. *Id.* at 334. The plaintiffs admittedly smoked cigarettes in addition to being exposed to asbestos, so after settling with the individuals, the asbestos producer sued the tobacco companies for unjust enrichment. *Id.* at 335. The asbestos producer claimed the tobacco companies should compensate the asbestos producer for the money it paid that "ought to have been borne by Tobacco Defendants." *Id.* The Mississippi Supreme Court explained that to recover under unjust enrichment, the asbestos producer would have to prove that the tobacco defendants "were liable for injuries suffered by the asbestos claimants, for which the claimants have been compensated by [the asbestos producer]." *Id.* at 342. Since a Mississippi statute precluded all tobacco cases based on products liability, the asbestos producer could

not prove this, so the court affirmed summary judgment for the tobacco defendants. *Id.* at 340, 342.

Here, the State alleges that Defendants are liable for opioid-related injuries for which the State had to pay. And Defendants have not pointed to an absolute bar on recovery under this theory such as the statute precluding recovery in *Owens Corning*. Therefore, it is plausible that Defendants were unjustly enriched because they continued to profit from unlawful conduct while the State paid for the repercussions. This too is sufficient to survive at the motion-to-dismiss stage.

5. Mississippi Consumer Protection Act

Next, Defendants seek dismissal of the State's claim under the Mississippi Consumer Protection Act ("MCPA") because the State has not alleged an ongoing deceptive act by Defendants. [55] at 29.

The MCPA prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." Miss. Code Ann. § 75-24-5(1). The State claims Defendants violated the MCPA "through their concealment, suppression, or omission of material facts" in their dealings with opioids. [46] ¶ 502. Defendants say the State's claim fails because it does not allege a present or future unfair trade practice. [55] at 29. Instead, it only points to past practices. *Id.*

Indeed, the State must allege "facts that support a reasonable inference of *present or future* illegal conduct that needs to be enjoined." *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1186 (Miss. 2020). This is because "the

purpose of the MCPA is to restrain or enjoin unfair methods of competition through *injunctive* relief." *Id.* at 1184 (citing Miss. Code Ann. § 75-24-9). Though the MCPA "also allows for the recovery of civil penalties for willful violations," those monetary damages are available only when there is an action for injunctive relief. *Id.*

Defendants say the State fails to allege present or future illegal conduct because it only refers to Defendants' past conduct and even acknowledges that Defendants have "implemented programs aimed at addressing opioid overutilization and abuse." [55] at 30 (quoting [46] ¶ 295). True enough, the State mentions programs that Defendants implemented to address the opioid epidemic. [46] ¶ 295–298. These programs target certain parts of the State's claims. For example, one program installs some utilization management restrictions on opioids. *Id.* ¶ 296.

But the programs do not cure all the alleged MCPA violations. And the State explicitly says that Defendants continued to promote uncontrolled opioid sales "even after implementing its Opioid Risk Management Program." *Id.* at 71. So the Court finds it plausible that Defendants are presently engaging in illegal conduct or will engage in illegal conduct in the future. *See Navient Corp. v. State ex rel. Fitch*, 313 So. 3d 1034, 1042 (Miss. 2021) (Plaintiff alleged facts to support the danger of a present or future unfair trade practice when it alleged that defendants suffered no consequences for their actions and remained active in its business.).

Defendants also challenge the State's MCPA claim because it "does not plead the purported fraud with particularity." [55] at 31. As this Court has held, "Mississippi does not require a finding of fraud for an act to be deemed unfair or

deceptive." *Mississippi ex rel. Fitch v. Eli Lilly and Co.*, 620 F. Supp. 3d 532, 542 (S.D. Miss. 2022) (quoting *In re Miss. Medicaid Pharma. Avg. Wholesale Price Litig.*, 190 So. 3d 829, 841 (Miss. 2015)). Rather, Mississippi courts are "guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act." *In re Miss. Medicaid Pharma. Avg. Wholesale Price Litigation*, 190 So. 3d at 841 (citing Miss. Code Ann. § 75-24-3). A trade practice is unfair if three factors are met: (1) it "causes or is likely to cause a substantial injury; (2) the injury is not 'outweighed by any countervailing benefits to consumers or competition that practice produces;' and (3) the injury could not have been 'reasonably avoided.'" *Id.* (citing 15 U.S.C. § 45(n)).

The Court finds that the State plausibly pleads these three factors. The State alleges Defendants participated in "unfair and deceptive marketing efforts, which were intended to mislead patients and practitioners as to the safety and effectiveness of prescription opioids." [46] ¶ 502. They did so by providing data to opioid manufacturers, skewing the results of studies on opioids, and placing opioids in favorable positions on their formularies. *Id.* ¶¶ 217, 219, 226, 397. These allegations sufficiently plead a "deceptive" practice under the MCPA. Accordingly, the State's MCPA claim survives.

6. Corporate Parent Entities

Lastly, Defendants argue that the State has failed to state a claim against "the corporate parent entities" because it "has alleged nothing more than standard parent-subsidiary relationships." [55] at 33. The Court agrees.

As the Court has explained, the Court lacks personal jurisdiction over two of the corporate parent entities—UHG and Optum, Inc. But the third, Evernorth Health, Inc. ("Evenorth"), did not join in the [52] Motion to Dismiss for Lack of Personal Jurisdiction. So the Court considers this Rule 12(b)(6) argument as to Evernorth only.

The allegations against Evernorth are similar to those against UHG and Optum, Inc. The State says "Evernorth is the immediate or indirect parent of all the Express Scripts entities named as Defendants, including the pharmacy, PBM, and research/analytics subsidiaries that operate throughout Mississippi." [46] ¶ 108. And it "controls the company policies that inform its mail-order and PBM services, including formulary design, with respect to the at issue drugs, as well as Express Scripts' analytics and research services." *Id.* ¶ 110. Further, "it, either directly or through its subsidiaries, evaluates drugs for efficacy to assist its customers with selecting 'clinically appropriate' drugs and formularies designed by Evernorth." *Id.* ¶ 111. After these allegations, the [46] Amended Complaint only refers to Evernorth as part of the eight "Express Scripts" Defendants. *See id.* ¶ 138. J

The Court dismisses Evernorth because the [46] Amended Complaint merely describes Evernorth as a holding company, not a tortfeasor. For example, the State says Evernorth "controls the company policies that inform its mail-order and PBM services, including formulary design." *Id.* ¶ 110. Controlling policies that inform services is two steps removed from actually designing formularies. Though the Court accepts well-pleaded factual allegations as true, it does not stretch conclusory

language into specific conduct. Without more, the [46] Amended Complaint does not allege tortious conduct by Evernorth. So the Court dismisses Evernorth.

In *Mississippi ex rel. Fitch v. Eli Lilly & Co.*, this Court denied a similar motion to dismiss two corporate entities, including Evernorth. No. 3:21-CV-674-KHJ-MTP, 2022 WL 18401603, at *5 (S.D. Miss. Aug. 29, 2022). But that case is distinguishable because the *Eli Lilly* complaint alleged that the corporate entities took specific actions to contribute to an insulin-pricing scheme. The State "alleged that CVS Health designed pharmacy benefit plans, negotiated with the Manufacturer Defendants, and publicly represented that it constructs programs to lower the cost of the at-issue diabetes medications" and that "Evernorth participated in the alleged Insulin Pricing Scheme." *Id.* These allegations established conduct such as designing, negotiating, representing, and participating. But the Court granted the motion to dismiss as to a third corporate entity because the only allegation against it was that it "provided retail services in Mississippi." *Id.* This allegation describes a relationship, not conduct.

Here, the Evernorth allegations are more like the *Eli Lilly* entity that the Court dismissed. The [46] Amended Complaint does not allege that Evernorth designed a formulary, negotiated with a manufacturer, represented anything to anyone, or participated in a specific scheme. It says Evernorth sits at the top of a corporate structure and sets policies. That is a description of a relationship, which is similar to the allegations against the corporate entity that the Court dismissed in *Eli Lilly*.

Thus, the State failed to allege actions Evernorth took to participate in or contribute to the tortious conduct. So the Court dismisses Evernorth.

## IV. Conclusion

For the reasons above, the Court grants the [52] Motion to Dismiss for Lack of Personal Jurisdiction and grants in part and denies in part the [54] Motion to Dismiss. Accordingly, the following Defendants are dismissed: UHG; Optum, Inc.; OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; OptumHealth Networks, Inc.; OptumRx Discount Card Services, LLC; Optum Perks, LLC; and Evernorth Health, Inc. And the Clerk of Court shall terminate Defendant The Lewin Group as the [46] Amended Complaint expressly dismisses it.

In doing so, the Court has considered all the parties' arguments. Those arguments not addressed would not have altered the Court's decision.

SO ORDERED, this 12th day of June, 2026.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE